# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Cardona*, 2013 IL 114076

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HERNANDO CARDONA, Appellant. |
| Docket No. | 114076 |
| Filed | March 21, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where there was a charge of unlawful restraint of a young girl but the accused was unfit to be tried criminally, an order for him to register as a sex offender did not deny due process where entered at a civil "discharge" or "innocence only" hearing pursuant to statute at which findings were made that the offense was sexually motivated and that the accused was not not guilty. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Lake County, the Hon. Fred Foreman, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy Defender, and Kathleen D. Weck, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Michael Nerheim, State's Attorney, of Waukegan (Michael A. Scodro, Solicitor General, and Michael M. Glick and Leah Myers Bendik, Assistant Attorneys General, of Chicago, of counsel), for the People.

Justices

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Garman, Karmeier, Burke, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, Hernando Cardona, appealed from an order of the circuit court of Lake County certifying him as a sex offender under the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2008)). On appeal, defendant argued, *inter alia*, that the sex offender certification should be vacated because it resulted from a violation of his procedural due process rights. The appellate court affirmed. 2012 IL App (2d) 100542. Defendant again appealed, and this court allowed his petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)).

¶ 2                                 BACKGROUND

¶ 3    Defendant was charged by indictment with one count of indecent solicitation of a child (720 ILCS 5/11-6(a) (West 2008)) and one count of unlawful restraint (720 ILCS 5/10-3(a) (West 2008)). Shortly thereafter, the trial court ordered an evaluation of defendant's fitness to stand trial. The clinical psychologist who evaluated defendant reported to the court that, among other things, defendant showed signs of "an acute thought disorder"; was "not oriented to place, person, and situation"; appeared to be in "an acute schizophrenic state"; and was incapable of understanding the nature and purpose of the legal proceedings or assisting in his defense. Based on these observations, the psychologist recommended that defendant be found unfit to stand trial. The trial court agreed, found defendant unfit, and ordered him transferred to the Elgin Mental Health Center for further evaluation and treatment.

¶ 4    After more than a year at the mental health center, defendant still had not been restored to fitness. Consequently, defense counsel moved for a discharge hearing. See 725 ILCS 5/104-25 (West 2008). In response, and pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2008)), the State filed a notice of intent to call

-2-

certain witnesses who would testify as to statements that A.K., the child victim, had made to them. The trial court held a section 115-10 hearing and concluded that the proffered statements were sufficiently reliable to be admitted as substantive evidence at trial or, in the absence of a trial, the discharge hearing.

¶ 5 The discharge hearing commenced nearly two years after the events leading to the charged offenses took place. At the discharge hearing, the now 13-year-old victim, A.K., testified that, on the afternoon of May 18, 2007, she was walking home from school when she heard her friend, D.H., calling her name. A.K. stopped walking and waited for D.H. to catch up. When D.H. caught up to A.K., she told A.K. that a man had been chasing her. The two friends then walked together for a time but separated again when D.H. turned a corner to meet her sister. Shortly after that, a man grabbed A.K. by the wrist and said to her, in a Spanish accent, that "whether [she] liked it or not, [she] was going to go with him." A.K. then tried to pull her wrist free from the man's grasp and when she could not break free, she kicked the man in the shin. At that point, the man let her go, and A.K. immediately ran away down the street toward her home. When she looked back, the man was no longer pursuing her but was now heading in the opposite direction away from her. Although A.K. did not get a good look at the man's face, she did notice that he was wearing black shoes that were "kind of torn up." A.K. recognized the shoes as those that were worn by a man who walked around "every day" by her school, a man she identified in court as defendant. A.K. could not recall one way or the other whether the man who grabbed her said anything to her about wanting to have sex with her.

¶ 6 D.H. testified that, on the afternoon in question, she was walking home from school when an older man whom she had seen before began approaching her. The man was wearing jeans and black shoes that "looked torn up like with holes in them." D.H. ran from the man and caught up with her friend, A.K. D.H. told A.K. about the man, and the two friends walked together to the corner, at which point D.H. turned while A.K. continued straight. D.H. identified defendant in court as the man who approached her that day.

¶ 7 A.K.'s father testified that, on the afternoon in question, he was standing in his front yard when A.K. ran up to him, crying and out of breath. A.K. was very shaken up and told him that something had happened to her, that a man grabbed her and told her that he "[was] going to have sex with her." A.K.'s father immediately called the police. A few days later, A.K.'s father spotted a man in the neighborhood whom he believed was the man who had grabbed his daughter. A.K.'s father testified that this man walked around their neighborhood "almost daily," and that the man was wearing a "worn-out, black pair of Converse" shoes that matched the description given by A.K. A.K.'s father identified defendant in court as the man he saw that day.

¶ 8 Officer Michael Taylor, a juvenile officer for the City of Waukegan, testified that he interviewed A.K. five days after the incident. A.K. first told Taylor about her encounter with D.H., in which D.H. reported that a man had been following her. A.K. then told Taylor that, after she and D.H. parted ways, a man grabbed A.K. by the right arm and asked her, in a Spanish accent, if she wanted to have sex with him. When A.K. replied that she did not, the man told A.K., "You need to." A.K. then tried to pull away from the man's grasp, and when she could not, she kicked the man twice in the shin. At that point, the man let her go, and

A.K. ran away. Although A.K. did not get a good look at the man's face, she was able to describe his clothing, including his black tennis shoes. D.H. later identified defendant in a photo lineup as the man who was following her that afternoon.

¶ 9    At the close of evidence, the trial court found defendant not guilty of the indecent solicitation charge. In doing so, the court stated in its written judgment order that there was "conflicting testimony" that left "some doubt" as to whether defendant verbally solicited A.K. for sex. As to the unlawful restraint, the trial court found that defendant should not be acquitted of that charge and therefore entered a finding of *not* not guilty.

¶ 10   Following the discharge hearing, the trial court ordered defendant to undergo further mental health treatment. Several months later, as defendant's term of extended treatment was coming to a close, the Illinois Department of Human Services reported to the trial court that defendant "remains Unfit to Stand Trial and, Unlikely to be restored to Fitness." In addition, the Department reported that defendant did not meet the criteria for civil commitment, as he did not pose a serious threat of harm either to himself or to others. At that point, the State filed a motion asking the trial court to certify defendant as a sex offender on the grounds that the unlawful restraint of which defendant was not acquitted was "sexually motivated." See 730 ILCS 150/2(B)(1), (1.5) (West 2008). The trial court granted the State's motion and entered an order (1) finding that defendant did not meet the criteria for civil commitment; (2) finding that one or more of the facts underlying the unlawful restraint indicated an intent to engage in behavior of a sexual nature; and (3) ordering defendant to register as a sex offender.

¶ 11   The trial court subsequently denied defendant's motion to reconsider, and defendant appealed. On appeal, defendant raised two arguments. First, he argued that the evidence was insufficient to support the trial court's finding that the unlawful restraint was sexually motivated. Second, he argued that his constitutional right to procedural due process was violated "in that he was deprived of liberty without a meaningful opportunity to be heard." 2012 IL App (2d) 100542, ¶ 46. The appellate court rejected both of these arguments and affirmed the trial court's judgment. *Id.* ¶ 54.[1]

¶ 12   This court allowed defendant's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)).

¶ 13                              DISCUSSION

¶ 14   Before this court, defendant no longer contests the sufficiency of the evidence to support the trial court's finding that the unlawful restraint was sexually motivated. Instead, he argues only that his right to procedural due process was violated.

¶ 15   A procedural due process claim presents a legal question subject to *de novo* review.

---

[1]The appellate court also addressed a jurisdictional argument raised by the State. See 2012 IL App (2d) 100542, ¶¶ 28-30. Although the State included that argument in its brief before this court, it later withdrew the argument at oral argument in light of factual points brought out in defendant's reply brief. We therefore have no cause to discuss or address that issue in this decision.

*People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 201 (2009). Procedural due process claims challenge the constitutionality of the specific procedures used to deny a person's life, liberty, or property. *Id.* The fundamental requirements of due process are notice of the proceeding and an opportunity to present any objections. *Id*. Due process is a flexible concept, and " 'not all situations calling for procedural safeguards call for the same kind of procedure.' " *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 272 (2004) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Courts should consider the following factors in evaluating a procedural due process claim:

> " 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Lyon*, 209 Ill. 2d at 277 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Statutory enactments are presumed constitutional, and to overcome that presumption, the party challenging the statute must clearly establish a constitutional violation. *Konetski*, 233 Ill. 2d at 200.

¶ 16    Here, we are hard pressed to apply the familiar *Mathews* factors, and most especially the second and third factors, as defendant does not identify for this court what "additional or substitute procedural safeguards" he is seeking. On the contrary, defendant's position, which was implicit in his opening brief and then made explicit in his reply brief, is that, given his unfitness to stand trial, "*no* additional procedural safeguards will be adequate" to protect his procedural due process rights in this case. It is defendant's position that, even if he were granted the full panoply of procedural rights afforded to adult criminal defendants, including the right to a jury trial, any resulting sex offender certification would *still* violate his procedural due process rights because, as someone who is legally unfit to stand trial, he is incapable of participating meaningfully in *any* proceeding in which his life, liberty, or property is at stake.[2]

¶ 17    Given the nature of defendant's argument, this court faces something of an analytical dilemma. This is because, although defendant insists that he is bringing a procedural due process challenge, and although all of the case law he cites and applies relates to procedural due process, it appears to us that defendant's challenge is more in the nature of a *substantive* due process challenge. This court has explained that, "[w]hereas procedural due process governs the procedures employed to deny a person's life, liberty or property interest, substantive due process limits the state's ability to act, irrespective of the procedural protections provided." *In re Marriage of Miller*, 227 Ill. 2d 185, 197 (2007); see also *People v. Tenner*, 206 Ill. 2d 381, 394-95 (2002) (noting the distinction between prosecuting a potentially unfit defendant without first holding a fitness hearing, which is a procedural due

---

[2]Defense counsel reiterated this at oral argument, telling the court that, in light of defendant's mental unfitness, "there are no procedures that can actually compensate for this man."

process violation, and prosecuting an actually unfit defendant, which is a substantive due process violation). In other words, a procedural due process claim asserts that the deprivation at issue is constitutionally invalid because the process leading up to it was deficient, whereas a substantive due process claim asserts that the deprivation at issue is constitutionality invalid in and of itself, irrespective of the process leading up to it.

¶ 18   Viewed in this light, defendant's claim in this case certainly appears to be one of substantive due process. Again, defendant's position is not that he was denied the process he was due, or that different or additional procedural safeguards would have rendered his sex offender certification constitutionally valid. Rather, defendant's position is that, because he can neither understand the nature and purpose of the proceedings nor assist his attorney in his defense, there are *no* procedural safeguards that the State could provide to constitutionally permit defendant's certification as a sex offender. Stated differently, defendant's position is that subjecting him, a legally unfit defendant, to proceedings resulting in sex offender certification is and always will be fundamentally unfair, irrespective of the procedural protections provided. That is a textbook substantive due process claim.

¶ 19   The problem this creates for us is this: By insisting that there are *no* procedural safeguards sufficient to permit the sex offender certification of a defendant who has been found legally unfit to stand trial, defendant to a large degree nullifies his procedural due process claim. Indeed, the State cannot deny that which it cannot provide. At the same time, defendant neither invokes nor applies even the basic principles of substantive due process, thereby precluding this court from considering his argument in those terms. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("[p]oints not argued are waived"). Under these circumstances, we believe that the only legitimate (and certainly most prudent) course is to consider, as best we can, only whether defendant has satisfied his burden with respect to the claim he is purporting to bring—that is, a procedural due process violation—and leave for another day any consideration of the substantive due process claim that is lurking just beneath the surface. See, *e.g.*, *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1, 7-8 (2003) (where respondent invoked only procedural due process principles, Court refused to recast respondent's procedural due process challenge to the Connecticut sex offender registration statute as a substantive due process challenge).

¶ 20   So with those preliminaries out of the way, we now turn to the merits of defendant's procedural due process claim. SORA's definition of "sex offender" includes any person who is charged with a "sex offense" and who "is the subject of a finding not resulting in an acquittal at a [discharge] hearing *** for the alleged commission or attempted commission of such offense." 730 ILCS 150/2(A)(1)(d) (West 2008). Here, defendant was charged with indecent solicitation of a child, which is always a "sex offense," and unlawful restraint, which is a "sex offense" only when the victim is under 18 years of age, the defendant is not the victim's parent, and the offense was "sexually motivated" as that term is defined in section 10 of the Sex Offender Management Board Act. 730 ILCS 150/2(B)(1), (1.5) (West 2008). At the conclusion of defendant's discharge hearing, the trial court acquitted defendant of indecent solicitation of a child but found him *not* not guilty of unlawful restraint. At the State's request, the trial court later entered a finding that the unlawful restraint was "sexually motivated." At that point, defendant fell squarely within SORA's definition of "sex

-6-

offender," and the trial court therefore ordered him to comply with SORA's registration requirements.

¶ 21    Defendant argues that his certification as a sex offender must be vacated because the proceedings that led to it were constitutionally deficient from a procedural due process standpoint. Conspicuously absent from defendant's argument, however, is any mention of what specific procedural safeguards were lacking. This is critical because "[t]he fundamental requirements of due process are notice of the proceeding and an opportunity to present any objections" (*Konetski*, 233 Ill. 2d at 201), and here, no one could possibly dispute that defendant received both of these things. The record confirms, and defendant does not dispute, that defendant was given full and adequate notice of both the charges against him and all of the subsequent proceedings. Throughout, defendant was represented by appointed counsel who, among other things, advocated zealously on his behalf, thoroughly cross-examined the State's witnesses, opposed the State's request for a finding that the unlawful restraint was sexually motivated, and filed a motion to reconsider that finding once it was made. Defendant had the statutory right to present evidence and call witnesses on his behalf (725 ILCS 5/104-25(a) (West 2008)), was protected at all times from conviction by the standard of proof beyond a reasonable doubt (725 ILCS 5/104-25(b) (West 2008)), and had the right to appeal any finding other than acquittal (725 ILCS 5/104-25(f) (West 2008)). And because he speaks only limited English, defendant received the regular assistance of a court-appointed interpreter. In short, although defendant did not receive the full spectrum of procedural safeguards afforded to criminal defendants, defendant *did* "receive[ ] several other important procedural protections before being required to register under [SORA]." *Konetski*, 233 Ill. 2d at 202.

¶ 22    In arguing that his right to procedural due process was violated, defendant at no point suggests what specific procedural safeguards he should have received either instead of or in addition to those set forth above. Rather, defendant's entire argument seems to be that it violates procedural due process to subject an unfit defendant to *any* proceeding in which life, liberty, or property is at stake because, by definition, such a defendant cannot understand or participate in it meaningfully. But as we have already said, due process is a flexible concept, and not all situations calling for procedural safeguards call for the same kind of procedure. Or to put it another way, procedural due process is founded upon the notion that, prior to a deprivation of life, liberty, or property, a party is entitled to " 'notice and opportunity for [a] hearing *appropriate to the nature of the case*.' " (Emphasis added.) *Jones v. Flowers*, 547 U.S. 220, 223 (2006) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

¶ 23    In many ways, the question before us was effectively settled in *People v. Waid*, 221 Ill. 2d 464 (2006). In that case, this court explained that, while the due process clause categorically bars the *criminal prosecution* of a defendant who is not competent to stand trial, the State may hold a *discharge hearing* with respect to such a defendant, even though an extended period of treatment and even involuntary civil commitment may result. *Id*. at 480. The reason for this is that a discharge hearing is not a criminal prosecution. Rather, it is an "innocence only" hearing that is civil in nature and "simply enables an unfit defendant to have the charges dismissed if the State does not have the evidence to prove he committed the

charged offenses beyond a reasonable doubt." *Id*. As a result, the due process considerations are very different, and a defendant in a discharge hearing simply is not entitled to the same degree of procedural safeguards as a defendant in a criminal prosecution. *Id*.

¶ 24　　In light of *Waid*, the only question that remains for us today is whether the procedural safeguards of a discharge hearing, which are sufficient to permit the extended treatment and possible involuntary commitment of an unfit defendant, are sufficient also to permit the sex offender certification of an unfit defendant. We hold that they are. To begin with, it is worth repeating that sex offender registration is not punishment. *Konetski*, 233 Ill.2d at 203. Rather, it is a regulatory scheme designed to foster public safety. *Id*. Accordingly, like persons facing an extended treatment period following a discharge hearing, persons facing sex offender registration are simply not entitled to the same level of procedural protection as those facing criminal punishment. *Id*. Moreover, if not released, an unfit defendant who is found *not* not guilty faces an initial treatment period of from one to five years. And if that defendant's condition does not improve, and certain other factors are present, this initial period can then be extended for up to the maximum sentence term to which the defendant would have been subject if convicted of the charged offense. In some cases, this will be decades. This is a substantial deprivation of liberty, and certainly greater than any that might be faced by an unfit defendant who is released from custody entirely, subject only to compliance with SORA. Though defendant attempts to make the case that the released sex offender suffers a greater loss of liberty than the person who, though not certified a sex offender, is involuntarily committed for 10, 15, or even 30 years, we are not persuaded by this even for a moment. Having one's freedom of movement *eliminated* is undeniably more burdensome than having it *restricted*, and without deciding whether sex offender registration itself implicates a constitutionally protected liberty interest, we have no difficulty saying that the procedural safeguards that constitutionally permit involuntary commitment also permit sex offender certification. Accordingly, we reject defendant's argument that his procedural due process rights were violated in this case.

¶ 25　　Before concluding, we wish to address one last point. At various points throughout both of his briefs, as well as at oral argument, defendant argues that it is fundamentally unfair to subject him to sex offender registration because he has never been convicted of committing a triggering offense. At one point, for example, defendant points out that "he has never been convicted of a crime for which sex offender registration is required." At another point, he notes that his "guilt has never been adjudicated, because he is unfit for trial and cannot be legally tried." At still another point, defendant argues that "the court's 'not not guilty' finding is being treated exactly like a conviction for purposes of SORA" and that "the government did an end-run around [his] due process rights as a person unfit for trial in order to reach the result it wanted, which was certification of this unfit defendant as a sex offender." The problem with this argument is that it assumes that the category "sex offender" is reserved for persons who are actually convicted of a triggering offense, and that defendant is somehow being manipulated into that category through unusual, if not improper, means. Nothing could be further from the truth. The category "sex offender" is entirely a creature of statute, and there are several ways a person can acquire that label, only one of which is criminal conviction of a triggering offense. Other ways include being found not guilty of a triggering

offense by reason of insanity, being adjudicated a juvenile delinquent as a result of committing a triggering offense, and, yes, being the subject of a finding not resulting in acquittal at a discharge hearing. See 730 ILCS 150/2(A)(1)(b)-(d), 5 (West 2008). In other words, defendant is not being subject to sex offender certification *despite* being found *not* not guilty of a triggering offense. Rather, being found *not* not guilty of a triggering offense is the *very definition of* "sex offender." The State did not do "an end-run" around anything. SORA includes persons like defendant in the statutory definition of "sex offender," and the State has every right to utilize and enforce that statute just as it is written.

¶ 26                                   CONCLUSION
¶ 27        For the foregoing reasons, the judgment of the appellate court is affirmed.

¶ 28        Affirmed.